UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RANA TECHNOLOGIES ENTERPRISES,

                Plaintiff,

vs.

L3HARRIS TECHNOLOGIES INC.,

                Defendant.

DECISION AND ORDER

20-CV-6343 (CJS)

_____

      Plaintiff RANA Technologies Enterprises ("RANA") filed this action against Defendant L3Harris Technologies Inc. ("Harris") alleging, *inter alia*, tortious interference with employment contracts, tortious interference with non-compete agreements, and aiding and abetting a breach of fiduciary duty. First Am. Compl. ("FAC"), Sept. 21, 2020, ECF No. 13. The matter is presently before the Court on Harris' motion to dismiss RANA's first amended complaint in its entirety for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and on RANA's motion to amend its complaint a second time. Mot. to Dismiss, Oct. 21, 2020, ECF No. 16; Mot. to Amend, Dec. 18, 2020, ECF No. 21.

      For the reasons stated below, Harris' motion to dismiss RANA's first amended complaint [ECF No. 16] is granted, and RANA's motion to amend [ECF No. 21] is denied.

LEGAL STANDARD

      At the outset, the Court notes that the purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir.

2006) (emphasis omitted). For instance, an action must be dismissed under Rule 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  To survive a motion to dismiss under Rule 12(b)(6), on the other hand, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where a plaintiff's factual allegations are "merely consistent with" a defendant's liability, those allegations "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (citation and internal quotation marks omitted). Nevertheless, Rule 12(b)(6) does not impose a probability requirement: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . ." *Twombly*, 550 U.S. at 556 (citation omitted).

## BACKGROUND

With the foregoing legal standard in mind, the Court has drawn the following background from the factual allegations in RANA's first amended complaint. The factual allegations contained in the complaint have been accepted as true, and all reasonable inferences drawn in RANA's favor. *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 26 (2d Cir.

2019).

RANA is a limited liability company established under the laws of the Islamic Republic of Afghanistan, with its principal place of business in Kabul, Afghanistan. FAC at ¶ 1. Harris is a manufacturer of communications equipment, which at all times relevant to this complaint, had its corporate headquarters and principal place of business in Rochester, New York. FAC at ¶ 4, 18. Starting in 2010, RANA served as a sales representative in Afghanistan for Harris' military communications equipment. FAC at ¶ 18. Beginning in 2013, Harris also contracted with RANA to recruit, train, and deploy local personnel to provide training and maintenance services on Harris' behalf to the Afghan National Security Force ("ANSF"). FAC at ¶ 21–22. Between 2010 and 2015, RANA was responsible for millions of dollars in sales of Harris equipment to ANSF and provided Harris with high level access to key decision makers. FAC at ¶ 92, 96.

In 2014, Harris started the Enterprise Sustainment Program ("ESP"), which included training and maintenance services such as those RANA had been providing. FAC at ¶ 23. Thereafter, Harris subcontracted with RANA through the ESP to provide training and maintenance services to Harris customers in Afghanistan. FAC at ¶ 24. Due to the intensity and the complexity of the training process, it took RANA up to three months to prepare a new employee for deployment in the field to provide services through the ESP. FAC at ¶ 29–30.

Sayed Mo Mohammad Reza Balkhi ("Balkhi") joined RANA as an employee in September 2010, shortly before RANA began work with Harris. FAC at ¶ 7. "For the next five years Balkhi was RANA's top representative for Harris work, supervised RANA's

work for Harris, and worked closely with Harris." FAC at ¶ 8. In 2013, RANA promoted Balkhi to be a director. FAC at ¶ 10. In 2015, RANA promoted Balkhi again, this time to Senior Director of the Tactical Comms Division. *Id.* In both of his director positions, "Balkhi was responsible for RANA's most important contracts with Harris and had access to RANA's highly confidential information regarding the pricing of its Harris work, including pricing structures and, most importantly, profitability." FAC at ¶ 11. In particular, Balkhi was responsible for RANA's involvement in the ESP. FAC at ¶ 45.

Sayed David Shah ("Shah"), Balkhi's cousin, began work as a RANA employee in May 2012. FAC at ¶ 13–14. During the course of his employment with RANA, Shah was eventually promoted to be a project/operations manager. FAC at ¶ 15. As a project/operations manager, Shah had access to highly confidential RANA information necessary to provide RANA's services to Harris. *Id.* He administered RANA's participation in the ESP, and was thoroughly knowledgeable of all the services RANA was providing to Harris through the ESP. FAC at ¶ 46. Sometime around August 2015, Shah and Balkhi – while still employed by RANA – formed their own company, Arianna Professional Services ("Arianna Services"). FAC at ¶ 52.

Russell Partridge ("Partridge") was the Harris Senior International Program Manager, Communications Systems Division, for the time period relevant to this action. FAC at ¶ 43. In his position, Partridge managed the ESP for Harris. *Id.* He worked closely with Shah and Balkhi to coordinate RANA's services to Harris through the ESP. FAC at ¶ 47–48.

In mid-to-late 2014, RANA's Executive Vice President and part owner, Farhad Ghafoor ("Farhad"), complained to Partridge about Partridge's "treatment of RANA personnel." FAC at ¶ 49. In response, Partridge became extremely angry, and said such things as, "You are going to regret the way you talk to me," and "I'll show you who controls the money around here." *Id.* After Farhad elevated his complaints to Partridge's superiors at Harris, Partridge appeared to become even angrier. FAC at ¶ 50.

Notwithstanding Partridge's anger, documents submitted by Harris[1] show that on October 17, 2015, RANA and Harris executed a service agreement under which RANA would be paid $574,600 for "First Wave of Training / Field Support Representatives." Services Agreement at 2, 26. Change Order 1, executed by the parties on October 31, 2015, indicated an increase of $507,000 in the agreement for a second wave of training and field support, making an updated subcontract total of $1,081,600. Services Agreement at 26.

Around that same time, RANA's human resources department informed Farhad that 22 of the RANA employees who were assigned to support Harris' customers through the ESP had resigned. FAC at ¶ 66–68. Shortly thereafter, RANA learned about Balkhi and Shah's formation of Arianna Services months earlier. FAC at ¶ 69. Farhad then

---

[1] With its motion to dismiss, Harris submitted a number of documents, including a copy of a services agreement executed between the parties, and two fully-executed change orders to that agreement. Mot. to Dismiss (Spyra Decl. Ex. A, Oct. 21, 2020, ECF No. 16-5 ("Services Agreement")). When deciding a Rule 12(b)(6) motion, the Court may not rely on matters outside of the complaint. Fed.R.Civ.P. 12(d). Nevertheless, "a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . ., [and] if a complaint relies heavily upon [a document's] terms and effect, that document is rendered 'integral' to the complaint and may be considered on a motion to dismiss." *Safran Elecs. & Def. SAS v. iXblue SAS*, 789 F. App'x 266, 270 (2d Cir. 2019) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002)) (internal quotation marks omitted). At oral argument, RANA did not oppose Harris' contention that these documents are properly before the Court on the present motion to dismiss.

accused Balkhi of recruiting RANA employees to Arianna Services, and fired him. FAC at ¶ 70. Balkhi did not deny recruiting RANA employees. *Id.*

Subsequently, Farhad spoke with RANA's administrative manager assigned to the ESP, Ahmad Mosavi ("Mosavi"). FAC at ¶ 72. Mosavi informed Farhad that Balkhi had told him that RANA was going to lose all of its work with Harris. *Id.* Mosavi also said that Balkhi had instructed him, Mosavi, to recruit RANA employees to Arianna Services by informing the employees that RANA was going to lose all of its Harris work, and that their jobs with RANA were therefore in jeopardy. FAC at ¶ 74–75.

On November 7, 2015, Farhad notified Partridge that many of RANA's former employees were working for Arianna Services, and that these former employees had non-compete clauses in their employment contracts with RANA. FAC at ¶ 77. Partridge apparently informed others at Harris because, on November 13, 2015, Farhad received a letter from Bill Conner, Harris in-house counsel. FAC at ¶ 78. Conner's letter assured Farhad that RANA took its legal and ethical obligations seriously, and asked for copies of the non-compete clause at issue and a list of employees to ensure they were not assigned to the ESP in violation of their post-employment restrictions. *Id.*

Notwithstanding Conner's letter, RANA's work with Harris started coming to an end in late 2015. FAC at ¶ 91. Among other things, RANA was barred from attending important briefing sessions at which Harris discussed upcoming needs, projects, and objectives, and RANA lost opportunities to bid on new work from Harris. *Id.* In addition, Harris terminated or refused to renew RANA contracts. *Id.* Change Order 2 to the RANA-Harris service agreement was executed on June 9, 2016, and indicated an increase of

$81,260 to Change Order 1's value for "Transition Off First Wave of Training / Field Support Representatives," making an updated subcontract total of $1,162,860. Services Agreement at 29. Change Order 2 also indicated that RANA had fulfilled its contractual obligations at several support sites, and that "[t]he remaining sites will be transitioned to other vendors in the near future in accordance with the Program Schedule Russ Partridge will communicate." *Id.*

RANA initiated the present action on May 26, 2020, and filed an amended complaint on September 21, 2020. At the heart of RANA's claims is the allegation that, "[o]n information and belief, Partridge wanted to make Farhad 'regret the way [he] talked to [Partridge']' and 'show [Farhad] who controls the money around here' by . . . ultimately severing all relations between RANA and Harris." FAC at ¶ 51. In other words, RANA alleges, based largely on the remarks that Partridge made to Farhad in late 2014, that Partridge harbored animus toward RANA and sought to destroy it. *Id.* To do so, he allegedly colluded with Balkhi and Shaw in their formation of Arianna Services and their recruitment of RANA employees, and then diverted all of Harris' contracts away from RANA to Arianna Services and other competitors, even though Arianna Services was employing former RANA employees in breach of the non-compete clause of their employment contracts. RANA's first amended complaint alleges that this conduct amounts to tortious interference with RANA's employment contracts, tortious interference with non-compete agreements RANA had with its former employees, breach of a non-disclosure agreement, and aiding and abetting a breach of fiduciary duty.[2]

---

[2] The parties agreed at oral argument that New York substantive law applies to RANA's claims in this case. Under New York law, "[t]here is a six-year Statute of Limitations for the causes of action for . . .

7

On October 21, 2020, Harris filed the motion to dismiss that is presently before the Court. Mot. to Dismiss, ECF No. 16. On December 18, 2020, RANA filed a motion to amend, attaching a proposed second amended complaint, which is also pending before the Court. Mot. to Amend, Dec. 18, 2020, ECF No. 21. The Court heard oral argument on January 7, 2021. Min. Entry, Jan. 7, 2020, ECF No. 26.

## HARRIS' MOTION TO DISMISS

In its motion to dismiss, Harris makes two primary arguments. First, Harris maintains that all of RANA's claims are within the scope of a release executed between the parties, and therefore must be dismissed. Alternatively, Harris argues that RANA's two claims of tortious interference and its claim of aiding and abetting a breach of fiduciary duty must be dismissed because they are inadequately pled, and that RANA's breach of non-disclosure agreement claim must be dismissed because it relies upon a clause that is not actually in the contract.

RANA concedes that its claim that Harris breached a non-disclosure agreement is without merit, and stipulates to dismissal of that claim without prejudice. Pl.'s Mem. of Law, 21, Dec. 18, 2020, ECF No. 20. With respect to the remaining three claims, the Court agrees with Harris that the first amended complaint must be dismissed in its entirety because RANA's claims were not adequately pled.[3]

---

aiding and abetting breach of fiduciary duty . . . (*see*, CPLR 213 [1], [2]) and a three-year Statute of Limitations for the cause of action for tortious interference with contract (*see*, CPLR 214 [4])." *Niagara Mohawk Power Corp. v. Freed*, 288 A.D.2d 818, 818–19 (N.Y. App. Div. 2001). However, according to the parties, there was prior litigation in this case, after which the parties executed a tolling agreement as they sought a resolution outside of the courts. Therefore, the parties agree that there is no statute of limitation issue in this case.

[3] Because the Court finds RANA's remaining claims were not adequately pled, it need not consider Harris' theory regarding the scope of the release executed between the parties.

RANA's Tortious Interference Claims

Under New York law, the elements of tortious interference with contract are (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)).

RANA claims that Harris tortiously interfered with its employment contracts with existing employees, and then, once those individuals had begun working with Arianna Services, with their non-compete provision from those same contracts.[4] Although RANA acknowledged at oral argument that it had no direct knowledge of Partridge's involvement in the formation of Arianna Services, or in the hiring away of RANA employees, RANA nevertheless claimed that the factual allegations it had made permitted the inference that Partridge's animus had led to tortious conduct. In particular, RANA pointed to the Second Circuit's decision in *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) for the proposition that pleading facts "upon information and belief" was justified "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the

---

[4] There are two contractual provisions at issue in these claims. The first provision reads, "During the Employment period, the Employee will not carry out any other employment . . . which competes with the business of the employer." FAC at ¶ 105. The second provision, the non-compete clause, reads, "For a period of TWO years after the end of employment, the employee shall not . . . be employed by any business similar to that conducted by the company, either by soliciting any of its accounts or by operating within the Employer's general trading area." FAC at ¶ 115.

9

inference of culpability plausible." *Arista Records, LLC*, 604 F.3d at 120 (quoting *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir.2008)).

After careful review of the pleadings in this case, the Court finds that RANA has failed to plausibly allege that Harris intentionally procured RANA's employees' breach of their contracts with RANA.[5] As recited above, the Supreme Court has stated that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In the present case, although RANA's theory of the claim is possible, RANA has not provided the "factual amplification [where] needed to render [its] claim plausible." *Arista Records, LLC*, 604 F.3d at 120 (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)) (internal quotation marks omitted). Rather it has relied on a series of conclusory allegations not entitled to the assumption of truth.

In particular, the foundation for all of RANA's claims against Harris is the conclusory allegation made "on information and belief," and derived from a heated exchange between Partridge and Farhad in late 2014, that Partridge wanted to destroy the RANA-Harris business relationship in order to make Farhad "regret the way [he] talked to [Partridge]." FAC at ¶ 51. The specifics of RANA's claim of tortious interference with the employees' employment contract builds upon that foundation with additional conclusory allegations that:

> 64. On information and belief, Balkhi and Shah would not have formed [Arianna Services] without Partridge's agreement that Harris would give

---

[5] Harris also argues that RANA's contracts with its employees were unenforceable under Afghan law, and that RANA failed to adequately plead Harris' knowledge of RANA's contracts with its employees. Without taking a position regarding Harris' respective arguments, the Court declines to opine on Afghan employment law where RANA's claims clearly fall short on other, more familiar, grounds.

10

> them work if they could provide Harris the services current RANA employees were providing Harris.
>
> 65. On information and belief, Balkhi and Shah received such assurances from Partridge before forming [Arianna Services].
>
> . . . .
>
> 73. The information [that led many employees to leave RANA, i.e.,] that RANA was going to lose all its Harris work could only come from Harris, most likely Partridge.

FAC at ¶ 64–73.

However, this theory, while consistent with the legal elements of liability for tortious interference with contract, is not consistent with the factual context of the RANA-Harris relationship during that time period. The Court views as especially significant in this regard the relatively large contract that Harris awarded to RANA in October 2015, nearly ten months after Partridge's angry remarks to Farhad and two months after the alleged formation of Arianna Services, for approximately $1 million (including the first change order).[6] Service Agreement at 26–27. The Court finds it implausible that Partridge, the head of Harris' ESP in Afghanistan, would seek to limit the capacity of one of Harris' service-providers at precisely the same time that Harris has awarded that service-provider a seven-figure contract to assist in the training and support for Harris and its ESP customers. Such allegations fail to "raise a reasonable expectation that discovery will reveal evidence" proving RANA's claim. *Twombly*, 550 U.S. at 556.

---

[6] As noted above, when the Court specifically inquired at oral argument whether this contract was properly before the Court on this motion, RANA offered no opposition to Harris' position that this contract was incorporated in the complaint by reference.

Further, the Court finds that RANA's claim that Harris tortiously interfered with the non-compete provisions of the former employees' employment contracts to be similarly implausible. To satisfy the third element of the claim, intentional procurement of the breach, "it is not enough that a defendant engaged in conduct with a third-party that happened to constitute a breach of the third party's contract with the plaintiff; instead a plaintiff must allege facts showing that the defendant's objective was to procure such a breach." *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp.3d 318, 327–28 (S.D.N.Y. 2017) (citing, *inter alia*, *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp.2d 213, 221 (S.D.N.Y. 2013)) (internal quotation marks omitted).

RANA's allegations with respect to the non-compete provision also build upon the foundational assertion that Partridge wanted to destroy the RANA-Harris business relationship in order to make Farhad "regret the way [he] talked to [Partridge]." FAC at ¶ 51. RANA alleges that it had always provided high quality service to Harris, and that Harris had "no legitimate economic justification" for the termination of the Harris-RANA business relationship. FAC at ¶ 97–98. Moreover, RANA alleges that "Harris was aware at all relevant times of the . . . non-compete agreements . . . yet Harris continued to solicit work from [Arianna Services] using the RANA Employees." FAC at ¶ 119. Hence, RANA suggests that Harris induced former RANA employees to work for Arianna Services solely to satisfy Partridge's "personal vendetta." FAC at ¶ 99.

However, as noted above, the Court does not find RANA's allegations regarding Partridge's personal vendetta to be reasonable inferences from the factual allegations in the amended complaint. With that in mind, taking all of RANA's plausible factual

12

allegations regarding Harris' alleged tortious interference with the non-compete provision as true, and drawing all reasonable inferences in RANA's favor, RANA has failed to allege that Harris intentionally procured RANA's employees' breach. Indeed, other than the implausible allegations regarding Partridge's personal vendetta, RANA's pleading does not address Harris' intent at all, and merely alleges that Harris was aware at all relevant times that Arianna Services employed over twenty former RANA employees, and that these former employees had non-compete agreements with RANA, and yet continued to solicit work from Arianna Services using RANA employees. FAC at ¶ 119. Even if factually true, the act of continuing to solicit work from Arianna Services does not amount to intentional procurement of the breach.

As one court in the Southern District of New York has pointed out, "[a]n illustration from comment n to the Restatement (Second) of Torts § 766 is particularly illuminating" with respect to situations such as this one:

> n. *Making agreement with knowledge of the breach.* One does not induce another to commit a breach of contract with a third person . . . when he merely enters into an agreement with the other with knowledge that the other cannot perform both it and his contract with the third person. For instance, B is under contract to sell certain goods to C. He offers to sell them to A, who knows of the contract. A accepts the offer and receives the goods. A has not induced the breach and is not subject to liability under the rule stated in this Section.

*Prospect Funding Holdings, LLC*, 256 F. Supp.3d at 328 (quoting Restatement (Second) of Torts § 766). *See also High Falls Brewing Co., LLC v. Bos. Beer Corp.,* 852 F. Supp.2d 306, 312 (W.D.N.Y. 2011) (also quoting Restatement (Second) of Torts § 766, Comment n (1979)); *John Paul Mitchell Sys. v. Pete-N-Larry's Inc.*, 862 F. Supp. 1020, 1029 (W.D.N.Y. 1994) (finding that plaintiffs' claim failed to show "inducement" even though defendants

knew the only way they could obtain plaintiffs' products was for someone in plaintiffs' distribution network to be in breach of its contract with plaintiff).

In the present case, RANA's conclusory allegations of Partridge's animus aside, RANA merely alleges that Harris entered into an agreement with Arianna Services with knowledge that its employees could not both perform under Arianna Service's contract with Harris, and honor the non-compete clause in their contracts with RANA. Consequently, RANA has failed to adequately allege that Harris tortiously induced RANA's employees to breach their agreements not to compete.

Aiding and Abetting a Breach of Fiduciary Duty

The elements of a claim for aiding and abetting a breach of fiduciary duty under New York law are (1) a breach by a fiduciary of obligations to another, (2) the defendant knowingly induced or participated in the breach, and (3) the plaintiff suffered damages as a result of the breach. *Ritani, LLC v. Aghjayan*, 970 F. Supp.2d 232, 254 (S.D.N.Y. 2013) (citing, *inter alia*, *S & K Sales v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir. 1987)). RANA claims that Harris aided and abetted a breach of fiduciary duties by RANA employees by declining "to remove APLS from its projects and, instead, accepting the services of those RANA employees and benefitting from the fruits of their disloyalty to RANA." FAC at ¶ 64, 136. Further, in its memorandum of law in opposition to Harris' motion to dismiss, RANA also alleges that "Partridge, motivated by malice supported the efforts of two high-level RANA managers – Balk[h]i and Shah – to form APLS and strip away from RANA its key employees and key Harris business . . . ." Pl.'s Mem. of Law, 22, Dec. 18, 2020, ECF No. 20. Neither of these allegations is sufficient to withstand Harris'

motion to dismiss RANA's claim.[7]

To begin with, even assuming it to be true and drawing all reasonable instances in RANA's favor, the allegation that Harris aided and abetted RANA employees' breach of fiduciary duties by continuing to engage Arianna Services when it knew that Arianna Services was benefitting from the fruits of RANA's disloyal employees does not sufficiently plead the second element of the claim: a showing of "inducement of" or "participation in" the breach of duty. A showing of "inducement of" or "participation in" the breach requires that the defendant have lent "substantial assistance" to the breaching a party. *Ritani, LLC*, 970 F. Supp.2d at 255. "Substantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* (quoting *In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005) (internal quotations and citations omitted)).

In the present case, the allegation is that Harris "failed to remove" Arianna Services from its projects – *i.e.*, did not act – once it learned of RANA's employees' disloyalty. However, under New York law, "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (N.Y. App. Div. 2003)). RANA advances no colorable theory under which Harris had a fiduciary duty to RANA. Therefore, RANA's

---

[7] Harris questions whether RANA adequately pled that RANA's employees owed RANA a fiduciary duty. As with the Court's reluctance to wrestle with the finer points of Afghan employment law, the Court finds it unnecessary here to examine the nature and scope of fiduciary duties under Afghan law.

pleading is inadequate.

With respect to RANA's argument that Partridge's "malicious" ploy to use Balkhi and Shah to form Arianna Services and strip RANA's employees and business away, this Court explained above why it finds those allegations to be conclusory and, therefore, inadequate. *See, e.g., High Falls Brewing Co.*, 852 F. Supp.2d at 322 ("These are the type of 'naked assertions' devoid of 'further factual enhancement' that are insufficient to state a claim.").

For the foregoing reasons the Court finds that all of RANA's claims in its first amended complaint must be dismissed.

## RANA'S MOTION TO AMEND

Having found RANA's first amended complaint to be without merit, the Court now considers whether RANA's claims may be saved by its proposed second amended complaint. RANA argues that its motion to amend should be granted because this action is still in its early stages, the filing of the second amended complaint will not prejudice Harris, and the proposed amendments present no futility concerns. Pl.'s Mem. in Supp., 3, Dec. 18, 2020, ECF No. 21-1. The Court disagrees: RANA's proposed amendments are futile.

Rule 15 of the Federal Rules of Civil Procedure states that "[t]he court should freely give leave [to amend a pleading] when justice so requires." Fed.R.Civ.P. 15(a)(2). "This permissive standard is consistent with [the Second Circuit's] strong preference for resolving disputes on the merits." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp.3d 199, 240 (S.D.N.Y. 2018) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d

Cir. 2011) (per curiam) (internal citation omitted)).

As the Supreme Court has indicated, however, leave to amend may be denied if the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[i]n the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive . . ., futility of amendment, etc. — the leave sought should . . . be 'freely given.'"). *See also Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015). Amendment is futile if the "amended portion of the complaint would fail to state a cause of action." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000). In other words, to merit leave to amend under Rule 15, the proposed amended complaint must be "sufficient to withstand a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

In its Proposed Second Amended Complaint, RANA "provide[s] clarification [regarding its allegations], but allege[s] few if any new material facts and [is] not required to address any fatal deficiencies in the [first amended complaint] because none exist . . . ." Pl.'s Mem. in Supp. at 3. In addition, RANA adds a claim for tortious interference with prospective economic advantage. Because RANA's second amended complaint offers no substantive change to the claims in the first amended complaint that the Court has already found insufficient, the Court finds that any proposed amendment to those claims would be futile. Additionally, the Court finds that RANA's claim for tortious interference with prospective economic advantage is also insufficient to withstand a motion to dismiss.

Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that "(1) it had a business relationship with

17

a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). The New York Court of Appeals has recognized that inducing breach of a binding agreement and interfering with a nonbinding "economic relation" can both be torts, but that the elements of the two torts are not the same. The Court of Appeals stated:

> [T]he degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights. Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior. Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant." (87 N.Y.2d at 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 [citations omitted].)

*Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004).

Setting aside RANA's tenuous proposition that the first element of its claim can be satisfied by the consideration of RANA's existing contractual employees as a "third party" with whom it might enter into an economically advantageous relationship in the future, the Court finds that RANA has failed to adequately allege that Harris acted solely out of malice, or used dishonest, unfair, or improper means. As stated above, the Court finds RANA's allegations regarding Partridge's malice to be "bare conclusory assertions that are not entitled to the assumption of truth" *High Falls Brewing Co., LLC*, 852 F. Supp.2d at 322 (citing *Iqbal*, 556 U.S. at 679). Moreover, the Court has also already found that Harris' conduct in retaining Arianna Services as a subcontractor – as alleged by

18

RANA – did not constitute wrongful means. "Wrongful means include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214–15 (2d Cir. 2002). None of those means has been adequately pled.

## CONCLUSION

For the foregoing reasons, it is hereby,

ORDERED that Defendant L3Harris Technologies Inc.'s motion to dismiss Plaintiff RANA Technologies Enterprises' first amended complaint [ECF No. 16] is granted; and it is further

ORDERED that Plaintiff RANA Technologies Enterprises' motion to amend [ECF No. 21] is denied. The Clerk of Court is respectfully directed to close this case.

Dated:    January 14, 2021
          Rochester, New York

ENTER:

_____
CHARLES J. SIRAGUSA
United States District Judge